We will hear argument first this morning in Case 12-158, Bond v. United States. Mr. Clement. Mr. Chief Justice, and may it please the Court, if the statute at issue here really does reach every malicious use of chemicals anywhere in the nation, as the government insists, then it clearly exceeds Congress's limited and enumerated powers. This Court's cases have made clear that it is a bedrock principle of our Federalist system that Congress lacks a general police power to criminalize conduct without regard to a jurisdictional element or some nexus to a matter of distinctly Federal concern. The President's negotiation and the Senate's ratification of a treaty with a foreign nation does not change that bedrock principle of our constitutional system. But, Mr. Clement, you said that the treaty is valid, and the implementing legislation seems to largely copy the words of the treaty without adding anything. So it's a puzzle that the treaty could be constitutional, but the implementing legislation that adds nothing, it's unconstitutional. Well, Justice Ginsburg, I guess I would quarrel with your premise, which is it is true that the convention and the statute use similar terms and terminology, but there's one very important difference between the convention and the statute. And that actually differentiates this case from Missouri v. Holland. And that difference is that the convention itself doesn't directly regulate individual conduct at all. And so all the convention does is go regulate individual conduct in exactly the way that this convention regulates State parties. And then what the legislation does is, as Justice Ginsburg said, just mirror the convention as the convention contemplated. Well, Justice Kagan, to be quite precise, though, what the convention says, and this is Article VII, Section 1, 33A of the Blue Brief Appendix, what it says is that each nation-State that signs the convention agrees in accordance with its constitutional processes to pass penal laws that make unlawful for individuals conduct that would violate the convention if undertaken by a nation-State. And I would respectfully suggest that making that translation, if you will, between what violates the convention if you're a nation-State and what would violate, what would be comparable individual conduct, is not obvious. And when the government does that through penal legislation, there's no reason why that penal legislation shouldn't have to comply. Sotomayor, as we promised with our constitution. Sotomayor, Mr. Clement, why not? Meaning there can be no doubt that chemical weaponry is at the forefront of our foreign policy efforts right now. Look at the Syria situation alone. It would be deeply ironic that we have expended so much energy criticizing Syria when, if this Court were now to declare that our joining or creating legislation to implement the treaty was unconstitutional, we're putting aside the impact that we could have on foreign relations. Why is it, if it's okay to regulate the possession of marijuana, a purely local crime, why is it unconstitutional to regulate the use of something that can kill or maim another human being? Clement, I don't understand where the disconnect is in terms of our Federal or State system. Well, Justice Sotomayor, I think it really gets down to the difference between Raich on the one hand and Lopez on the other, which is this Court has held that it is a classic and rational way to regulate commerce to basically prohibit certain items from commerce. So why isn't the same? There's no dispute that these chemicals were transported against along interstate lines. Well, I mean, that's not even disputed in this case. But I don't think it was really disputed in Lopez that the firearm would have had to cross State lines. But the problem in Lopez was the Federal statute was not structured in a way that had a jurisdictional nexus that made the statute only applicable as a regulation of an item. Scalia, we didn't take this case to decide the Commerce Clause question, did we? The government didn't even assert it below. It asserts it now. But as we took the case, the issue was whether the treaty supported the laws. That's right, Justice Scalia. And we do think that the government, like a private party, can waive a constitutional argument. On the other hand, I would say that we're not particularly concerned about the Commerce Clause argument, because we think the Commerce Clause argument has the same basic defect as the treaty power argument. Do you think, Mr. Clement, and this goes back to Justice Ginsburg's question, could this treaty have itself regulated individual conduct? Could the treaty have been self-executing? Well, I think that's an interesting question, and I don't think the Court needs to answer it. I mean, I would take the position that if there really were a self-executing treaty that tried to impose criminal prohibitions, and I don't think there is any but if there were one, I would say here that it violates the Constitution for the same basic reasons that this implementing legislation does. But I, but I So where would you find that in the Constitution? Because there's clearly a treaty power that does not have subject matter limitations. And indeed, if you go back to the founding history, it's very clear that they thought about all kinds of subject matter limitations, and James Madison and others decided quite self-consciously not to impose them. So where would you find that limitation in the Constitution? I would find that limitation in the structural provisions of the Constitution and the enumerated powers of Congress. And I would say that it would be very analogous Well, this is an enumerated power. The enumerated power is the treaty power. So you have to find a constraint on the treaty power. Where does it come from? Well, I think that where it would come from, again, is the structural provisions of the Constitution. If we had a self-executing treaty that purported at a national level to commandeer State and local police officers, I would think that there might be, you could call it a Tenth Amendment objection, you could call it an enumerated power objection, there might be an objection to that treaty. Well, don't you think the word treaty has some meaning? It is certainly true that going back to the beginning of the country, there have been many treaties that have been implemented in ways that affect matters that otherwise would be within the province of the States. One of the original purposes of the objectives of the Constitution was to deal with the treaty power, was to deal with the issue of debts owed to British creditors. And there have been cases about the property rights of foreign subjects, about the treatment of foreign subjects here, about things that are moving across international borders, about extradition and all of those. But in all of those, until fairly recently, certainly until generally after World War II, all of those concerned matters that are of legitimate concern of a foreign State. That was the purpose of the treaty. So can't we see something in that, in the meaning of a treaty, what it was understood to mean when the Constitution was adopted? I think that's right, Justice Alito, and I didn't mean in answering Justice Kagan's question to fully accept the premise that there's no limit on the treaty power whatsoever. But I do think that it's important to recognize that in the context of non-self-executing treaties, there's a real opportunity to leave for another day the question of whether the treaty itself is valid, because sometimes a treaty is non-self-executing precisely because the Senate recognizes. Kennedy, if you had been the President's counsel, would you have advised him that it was unconstitutional to sign this treaty as written? No, absolutely not, Justice Kennedy. But that's precisely because it's a valid non-self-executing treaty. By its terms, it doesn't do anything to directly regulate individual conduct. And if I were the President's counsel, I would have said, honestly, Mr. President, I don't think this requires us to have any law that applies to garden-variety assaults with chemicals. But if we need that to discharge our treaty obligations, the States are absolutely ready and able to shoulder that task. There's no State in this country that doesn't have a general assault statute that would be covered by this conduct. There's no State that doesn't have a murder statute that would cover this conduct. Ginsburg. Mr. Clement, there's an irony in what you just said, because the victim many times went to the State police and said, please help me. And they turned her away a dozen times, and finally they said, go to the post office. So this doesn't seem to be you are arguing that this trenches on the State's domain. And yet in this very case, it wasn't until the State referred her to the post office, Federal officials, that she got any action. Clement. Well, Justice Ginsburg, one way to understand that is that the State of Pennsylvania exercised its prosecutorial discretion not to pursue this matter. I don't think that — I don't even think the government says that that exercise of prosecutorial discretion put us in violation of our treaty obligations. Our treaty obligation at most is to have a law that prohibits this conduct, which the States certainly do. The treaty obligation is not to make sure that every single use, malicious use of chemicals is in fact prosecuted by the State or local officials. Mr. Clement, can I make sure I understand your test? Your test is to say that with respect to every prosecution under this — under this treaty, that a court has to ask whether the prosecution has a sufficient nexus to national or international concerns. Is that your test? No, that's not my test, Justice Kagan. I would actually come at it from the other end of the stick, which is to say that the one thing I think I know from this Court's precedents is that the Federal government doesn't have a general police power. So as I look at this statute, it can either be saved by essentially creating a jurisdictional element out of the phrase peaceful and equating it with non-warlike. Or if the statute really has this general character, then at least as applied to the chemicals here, which are pure dual-use chemicals, it can't be constitutionally applied. Well, I guess I'm still looking for a test, and I thought that the test that I just articulated was really directly out of your briefs. But if it's — if you're suggesting that that's not the test, give me the test that we're supposed to ask with respect to this case or any other as to whether the prosecution is unconstitutional. It's whether the Federal statute exercises a general police power. And if it does — That sounds like a facial challenge. Now, I thought that you made very careful to talk about that this was an as-applied challenge to this particular prosecution. Well, that's because the only relief I'm seeking is to have my client's conviction vacated. So this is the classic as-applied challenge. Now, the reasoning that the Court may employ in vindicating my as-applied challenge may suggest that the statute is unconstitutional in some or all of different  But our claim has always been that the statute does not exercise a general police power. So you're saying if the statute extends to things that we've generally thought of as part of the police power, that's sufficient? I would say that if a Federal statute exercises the police power, by which I mean it criminalizes conduct without regard to a jurisdictional element or some nexus to a matter of distinctly Federal concern, then that statute exceeds Congress's power. That was the case in Lopez. That was the case in Morrison. And I think, unless you accept our narrowing concern, that's the case here. Okay. Nexus to a national concern, again, is what I understood you to say in your brief. But let me give you a hypothetical, and you tell me whether your test meets it. Let's say it's the same convention, except it relates only to sarin gas. And there's a chemist out there, and, you know, the implementing legislation mirrors the convention. There's a chemist out there who manufactures sarin gas. I take it it's pretty easy to manufacture. And sends it through the ducts of a house and kills everybody in it. Does that have a nexus to national concerns? It does, Your Honor, and it would be valid legislation precisely because sarin is something that clearly Congress could prohibit in all its uses. And as I understand how this statute applies to sarin gas or other things, certainly on Schedule I, there's some Schedule I substances that are talked about both in the convention and the treaty. Those things are always unlawful. What is particularly unusual about the statute's application to something like potassium dichromate or vinegar or whatever you have, is that in most of its possession and uses, it's perfectly lawful. And what makes it a chemical weapon in the government's theory is when it's used purely interstate in a malicious way. Kagan. So, but this is, in my hypothetical, and you didn't run away from it at all. I applaud that. In my hypothetical, it's a completely domestic use. You know, it's just this chemist didn't like his neighbor and used sarin gas. And you're saying that the difference is, well, what the treaty makers did was define the category of chemicals more broadly. And I guess what I want to know is, you are imagining a world in which judges day-to-day try to get inside the head of treaty makers to think about, you know, in this case, we understand that there's a national interest in regulating sarin gas, but we don't think that there's a sufficient national interest in regulating some other chemical or some other chemical or so on down the line. It seems to me a completely indeterminate test and one that would have judges take the place of treaty makers in terms of deciding what is in the national and international interest. Well, Justice Kagan, I would beg to differ. I actually think that our approach to this case avoids judges being put in that difficult position precisely because we distinguish, unlike the government, between the validity of the convention and the validity of the implementing legislation. And then as to the implementing legislation, we simply ask the courts to do what they do in every other context, which is to check and see if that implementing legislation is consistent with our basic chartering document. And it's the government's position, which I don't really understand why this would work, but their theory is that if the non-self-executing treaty is valid, then the implementing legislation is ipso facto somehow valid. And that's not right. Think about the convention that was before this Court in the Medellin case, the Vienna Convention on Consular Notification. It puts an obligation on any arresting official to provide notification to the consulate about an arrested foreign national. Now, I suppose it would be a perfectly rational way to implement that convention to have a national police force. And so every arresting officer is a Federal officer who is fully apprised of the Vienna Convention responsibilities. That would be a rational way to implement the treaty, but it wouldn't be remotely consistent with our Constitution. On the other hand, that same valid non-self-executing treaty can be validly implemented by chartering the State Department to work with police officers on a State and local level to understand their obligations. Alitoso, do you think it would be difficult for a judge to ask, is there any possibility that there is any other country in the world that has the slightest interest in how the United States or any of its subdivisions deals with the particular situation that's involved in this case? Justice Alito, I think that would be one way of approaching the question. I think that would be a ministerial test. Would you think that would be beyond the ability of Federal judges when a case like this comes before them? I don't think it would be beyond their ability. I also don't think it would be beyond the ability of a Federal judge to say, okay, let's hypothetically ask the question, in the absence of a non-self-executing treaty, would Congress have the power to pass this statute? And if the answer to that is no, then I think the burden sort of shifts to figure out why it is that the treaty adds something to the powers of the Federal government. And I think this, just to make clear, I think this is a very different context from what the Court had in Missouri v. Holland, because there the treaty itself prohibited individual action. An individual violated the treaty if they took a migratory bird out of season. And so in that sense, the enforcement statute did nothing more than put a criminal penalty on violating conduct that was already prohibited to the individual. In that context — Kennedy, is it one way to characterize your argument, or is it too unfairly confining to your argument, to say that what you're suggesting is something like a clear statement rule, that if the treaty intends nation-states to have their own constitutional structures superseded, at a minimum it has to say so, and then we will come to the question whether or not they can do it? I think there would be a fair characterization of our argument, but only to add that this would be the anti-clear statement case, because the one place that this Convention talks about imposing obligations on individuals, it's a promise by the nation-state to pass penal legislation that is in accordance with their constitutional systems. So it's very bizarre that it's Article VII, Section 1. It's, I think, 33A. So it's very bizarre when the only way we're reaching individual conduct here, unlike the treaty in Holland, is a United States promise to pass legislation that comports with our constitutional process, to say that the Convention, therefore, allows us to pass legislation that doesn't comport with our constitutional  Well, again, but I think the question is the same. Scalia, I don't understand how you distinguish sarin gas. Why is sarin gas different from vinegar? Because sarin gas is, I think, more equivalent to something that the Congress would try to deal with like the way it dealt with marijuana in Raich. I think it's just a reflection of the idea that when you're talking about things where the Federal government is trying to prohibit it, then there's a greater Federal power to do that. And I think with sarin gas, you could imagine, put aside the commerce power for a second, put aside the treaty power, it may be that with sarin gas, even under the war powers, the Federal Congress can say, look, that's something that's, you know, it's sort of inherently a chemical weapon, and we're going to prohibit people from having that. That's very different from these situations where, if you think about it, the only thing that makes these chemicals chemical weapons instead of chemicals is their internal interstate use in a malicious way. And that's different, I think, from at least a hypothetical statute that says, look, here are, I mean, there's three schedules in the statute, 43 different chemicals that are particularly problematic. If the Federal government wants to regulate those and prohibit the unauthorized possession of those, I don't see why they couldn't do that with or without the treaty. But what's so anomalous here is the idea that these chemicals, everything, rat poison, vinegar, whatever it is, these things are perfectly lawful. We don't think of them as chemical weapons, less than until they're used in a malicious way, and then all of a sudden they become classified as chemical weapons. That's a very odd statute, but it does, I think, operate in a way that is just inconsistent with the bedrock principle that the Federal Congress just doesn't have this kind of police power. Breyer. Is the chemical used here one of the chemicals that's listed in the annex to the treaty? I don't believe so. It's certainly not one that is listed on the three schedules. There are 43 chemicals. Neither of these are on there. And I do think there is an important difference, because this is perhaps an odd way to think about it, but, you know, this is a statute that's really trying to regulate nouns, chemical weapons. And with respect to something like weaponized chemicals or sarin gas, it makes sense to say those are chemical weapons. But with respect to otherwise harmless chemicals, the only thing that under the government's theory turns them from chemical weapons — I'm sorry, from chemicals into chemical weapons isn't a noun, it's a verb, it's their malicious use. And that puts you in a very odd sort of situation. And I think that, you know, if Congress had come in and said, look, there are certain chemicals that by their very nature are almost inherently weaponized, I think Congress would have a lot more authority to proceed in that kind of situation. Sotomayor, we do — we permit that in all sorts of definitional sections of the Criminal Code. We call a dangerous weapon anything that you use to inflict serious injury on someone. I don't think of a car as necessarily a dangerous weapon. It is something I use to transport myself. It's only when I'm using it for a prohibited purpose that it turns itself into a dangerous weapon. Well, so I'm having a problem with this noun-verb distinction. Why isn't the intentional burning, killing of another human being using chemicals the essence of what this treaty is trying to stop? I thought that's what it was trying to do. You want to add on the warlike purposes, but the treaty permits exceptions for any peaceful purpose. Justice Sotomayor, a couple of points. First of all, generally you might be right that the criminal law takes objects that are otherwise innocent and say they can be used in a malicious way and criminalizes it, but most of that work is done by State and local criminal law, and at the Federal level, you need something else. You need a jurisdictional element, something that has a distinct Federal concern. Second, as to the concerns about this concern. Sotomayor, the treaty power. Well, I don't think that the treaty power, especially when there's this much of a disconnect between what the treaty power does and what the statute does, which is the treaty, again, does not directly regulate at all individual conduct. It is regulated at nation-state conduct. Now, with all due respect, I don't think that nation-states poison romantic rivals, attempt to commit suicide, or try to get rodents out of their houses. And so when individuals do those things, I think it's hard to draw an analogy between what's forbidden to a nation-state and the individual action. But any work that is done in the statute by drawing that analogy is done by the statute and not by the convention.  Sotomayor, I don't think it's fair to say that if you put it on every doorknob in Boston, that wouldn't be regulated by this or why? The very exact same chemicals. Right. And we would say that under our narrowing construction that that's covered because it's a warlike use of the chemicals. We would also point out for the record that that same conduct would obviously be covered directly by Federal statutes that target terrorism directly. So no matter how you decide that case, whether you accept our narrowing – if you accept our narrowing construction, that conduct will be covered by two Federal statutes. If you don't accept our narrowing construction but hold this statute unconstitutional, then that conduct is still going to be covered. And I just think when you're trying, again, to think about what the convention is after, it is not really after Ms. Bond's conduct. I don't think any one of our treaty partners said, oh, my goodness, there's been a deployment of chemical weapons in Norristown, Pennsylvania. I sure hope the United States steps up to its treaty obligations and prosecutes this horrible deployment of chemical weapons. Nobody would say that because nobody speaking normal English would identify this as a deployment of chemical weapons at all. Kagan. But, Mr. Clement, it's absolutely clear that the treaty was after enforcement as to individuals with respect to all the prohibitions, that the treaty said, go enforce this as to individuals and do it consistent with your constitutional prerogatives. And it is consistent with our constitutional processes. And then Congress passes a law that is consistent with its constitutional processes, and it completely mirrors the treaty. Two things, Justice Kagan, neither of which will surprise you, I suppose. One is I don't think this is consistent with our constitutional processes. Right. And I guess I'm still trying to figure out why. I mean, Holmes dealt with this in Missouri v. Holland. He says there's a treaty power, it's an enumerated power, there's a necessary and proper clause that functions to allow Congress to give effect to that treaty power. It's – you know, this is a situation where there's a prohibition on the States in terms of entering into treaties or in terms of sharing that power in any way. And he says, you know, it's just these invisible radiations that you think come from the structure of the Constitution. And he specifically rejected this argument, the same argument that you're making, the prenumbers and emanations of the Constitution. Justice Kagan, I think you have to read Missouri v. Holland both in the context of the treaty that the Court had before it and the argument that it had before it. Missouri made a very strange argument, Missouri v. Holland, one that no modern litigant would make. They made an argument that they went out of their way to identify a conflict between the Federal treaty and State law and said, therefore, we win under the supremacy clause. And Holmes scratched his head and said, no. The treaty under Article VI is supreme to the State law, not the other way around. But he also said this one sentence that sort of bedeviled the lower courts here, which says, well, and if the treaty is valid, of course the legislation is valid. That made sense in the context of the treaty he had before him, because he had a treaty that directly prohibited individual conduct and a statute that enforced that individualized prohibition with criminal penalties. So in that case, I suppose it was right that the treaty and the implementing legislation stood or fell together. That's not the case here, if I could reserve my time. Roberts. Thank you, counsel. General Verrilli. Mr. Chief Justice, and may it please the Court. The Framers gave the Federal Government exclusive control over the treaty function to ensure that it could knit the nation together as one and allow it to be fully sovereign in the conduct of foreign affairs. Petitioner's ad hoc, too local limit on the treaty power can't be squared with the judgment the Framers made, this Court's precedent, or consistent historical practice since the time of the founding, and it would compromise foreign affairs and national security interests of the First Order. Counsel, General, let's suppose there's a multilateral treaty, the International Convention to ensure that national legislatures have full authority to carry out their obligations, i.e., that the national legislature has the police power. And Congress passes a statute saying we have the authority to prosecute purely local crimes pursuant to this International Convention that the President has signed. Any problem with that? There may well be. Let me walk through the analysis that I think you'd have to go through. First, I would make the point, Mr. Chief Justice, that it seems unimaginable that a convention of that kind would be ratified by two-thirds of the Senate. It also seems unimaginable that you would bring this prosecution, but let's leave that. And that does go to the point. And just to press it further, the point is that it's a transfer of authority from the States to the national legislature. I don't know why you'd look to the national legislature to say, well, we'd never do that. Well, the Framers thought that the two-thirds guarantee, the two-thirds ratification requirement was an important structural guarantee to protect the interests of the States. At a time when the Senate was elected by the State legislatures. Yes, Mr. Chief Justice, but there's no doubt that the Framers thought that would be an important protection. But beyond that, this Court has said that there is an inquiry. It said in dictum it is never held that a ratified treaty exceeds the Federal Government's constitutional authority. It's never held that a provision implementing a ratified treaty exceeds the Federal Government's constitutional authority. Scalia, so your answer is if that unimaginable thing should happen, it would be okay? No. My answer is this, that the Court has said that there is an inquiry into whether the – it is a proper subject of a treaty, and that that inquiry could take into account whether it is imposing a fundamental change in the character of the government. But that's not a question the Court needs to answer here, because this treaty, the Petitioner concedes, is a valid exercise of the treaty power, and the legislation implementing this treaty is coextensive with the obligations of the treaty there is no question. I don't know why it would not be a valid exercise of the treaty power. A case like Medellin caused serious conflict with our international obligations because we held, look, the Federal Government does not have the authority to tell the sheriff in Texas what to do. That caused a great deal of strain in our international relations. And I think the United Nations could well say, look, we don't want treaty parties to have to deal with whether it's somebody in this State or somebody in that province who has the authority. So every signatory must have the authority. It doesn't strike me as not reasonably related to international obligations. Roberts. But here, Mr. Chief Justice, this is a valid exercise of the treaty power, and there is no daylight between the implementing legislation and the obligations that the Petitioner has. I know the case, and therefore, and therefore, that may be a question that the Court would have to answer in a different case, but this case doesn't present the opportunity to answer that question. Roberts. The purpose of my hypothetical was to try to find out if there is any situation in which you believe an erosion or intrusion by the Federal Government on the police power could be a constraint against an international treaty. There may be an outer bound, but this case is nowhere close to it, and it isn't It can't be a two-local exception to the treaty power, which is a sufficient  Roberts. Well, it seems to me that if you say there may be an outer bound, but this case isn't one of them, you're subjecting yourself to the same criticisms that have been leveled against the other side, that you're proposing a case-by-case evaluation with respect to each treaty. No. I think, Your Honor, that the question here is whether this legislation validly implements a valid treaty. The treaty is concededly valid. The legislation is concededly valid on its face. Scalia I'd like to explore that, your proposition that there is no daylight between the treaty itself and the implementing legislation. It seems to me there is a lot of daylight between the two. Let's take, and I pick this example not because it's controversial, but because it relates to an area where the Federal Government has never been thought to have authority, namely family law. There are no, you know, Federal marriage, Federal divorce, Federal adoption. It's all been State law. Let's assume that an international treaty is approved by two-thirds of the Senate and the President, which requires States to approve same-sex marriage. All right? Now, if that were a self-executing treaty, same-sex marriage would have to be approved by every State. If it is not self-executing, however, it will be up to Congress to produce that result, and Congress would do it, or could do it at least, by having a Federal marriage law. And then you would have to have a Federal divorce law. And I suppose a Federal adoption law. I think there is a big difference between just doing it through a self-executing treaty and dragging the Congress into areas where it has never been before. I think there is daylight between the treaty and requiring the treaty to be implemented in the fashion that you assert is necessary here. I would like to make a structural point and then a specific point about this case. The structural point, Justice Scalia, is this. If it is the case, as Your Honor's hypothetical seems to concede and as I believe Petitioner concedes, that a self-executing treaty that requires the President to negotiate it and two-thirds of the Senate to ratify it can impose an obligation of that kind, then it has to be the case that a non-self-executing treaty that is the same approval of the President, the same two-thirds ratification, and the additional structural protection of passage of legislation by the Senate, the House, and being signed into law to the President can do what the self-executing treaty can do. It has to be the case. The power, if the ---- Scalia, I don't think it has to be the case. I think there is a great difference between requiring the States by a self-executing treaty to permit same-sex marriage and dragging the Federal Government or allowing the Federal Government to enter into this whole field of marriage, divorce, adoption, family law, where the Federal Government has never been. Well, with respect to the point with respect to this treaty, I don't think there is, with all due respect, there is any daylight here with respect to this treaty. Section 229A does precisely what the treaty obligates the United States Government to do, and I think the notion that the treaty obligation can be satisfied by relying on the States to enforce their assault laws, which I think is the core of my friend's argument here, is directly contrary to the history of the framing in which it's very important. Breyer, it is, it is, that's the part that I can't yet get my mind to these dramatic questions of whether here the local police power or in some other case some other inherently State power make a treaty beyond the power of the Federal Government to enter into. It's a very big question, but I'm not there yet. And the reason I'm not there is because there are some words in this treaty called other peaceful purpose, and we have to interpret those words, and the same words are in the statute. And my question to you is what reason is there to think that those matters on List A fall within those words? What is List A? It's infinitely long. A few things on it are in Holmes' opinion in Peaslee, a great case on attempted murder, where he talks about paying a small boy to move a barrel of kerosene with a candle in it, a lid, so that it will burn down a barn after a few hours. The kerosene is a chemical. He talks about a case where a person went to a racetrack and gave a horse a poisoned potato. He talks about a case involving somebody else trying to light a match, which is a chemical, and setting fire to a haystack. We can all think, sadly, of athletes, Lance Armstrong, at least accused of unlawfully taking drugs. I mean, why do we think matters of List A fall within those words outside the words other peaceful purpose, even though they are unlawful? And by the way, did anyone say to the drafters of the convention, I found nothing in this brief on the point, or did anyone tell Congress that poisoned potatoes, drug-enhancing, performance-enhancing drugs, the example that Justice Alito used last time, you give a vinegar to a goldfish, I mean, these are all chemicals not in the annex, but they are chemicals, and they are absolutely nothing to do with chemical weapons? And why do we think that we have to get beyond that fact? Verrilli, There's a very important point here, and it gets, I think, to the heart of what the national interest is in this case with respect to this treaty and this implementing legislation. And the harm in here is in the process of line drawing. What the Petitioner is asking as a rule of either constitutional law or statutory construction is that courts, on a case-by-case basis, after the fact, make ad hoc judgments about whether the. Breyer, No, no, there's an easy way out of that. All we do is say the chemicals involved are the chemicals in the annex. But you're not prepared to say that, I guarantee you. Verrilli, No, I'm not. Breyer, Okay. Now we're outside the annex, and I guess once we get outside the annex, we either have to draw lines or we have to say, well, this encompasses the poisoned potato, the poisoned goldfish, the small boy with the candle, the performance-enhancing drugs. I would say judges are here to draw lines, and between throwing all those things into it or drawing lines, it's better to draw a few lines. Verrilli, We can talk about hypotheticals, but the key point about them is that they are hypothetical. And we have to draw lines. Breyer, No, no, these are real cases, by the way. The poisoned potato was, in fact. Verrilli, The vinegar in the goldfish is not a real case, and I would submit that the mills don't cure out Black's. They're not real cases because you haven't prosecuted them yet. If you told ordinary people that you were going to prosecute Ms. Bond for using a chemical weapon, they would be flabbergasted. It's so far outside of the ordinary meaning of the word. The Mississippi statute has an enormous, an enormous breadth. Anything that can cause death or injury to a person or an animal, would it shock you if I told you that a few days ago my wife and I distributed toxic chemicals to a great number of children? Verrilli, Your Honor, I understand. Alito, On Halloween, we gave them chocolate bars. Chocolate is poison to dogs, so it's a toxic chemical under the chemical weapons. Verrilli, Again, I think the minimists don't cure out Lex would take care of that. But this series, there is a series of cases. And I'm not going to tell you that all over the place. This is, with all due respect, this is serious business. With all due respect, the line that the Petitioner is asking. Breyer, I'm not. I want your answer to the line. My question was a question to get your answer. And the answer that I wanted you to address yourself to is the problem of once you And we can tell joke after joke, but it's not a joke that it's so easy to make up examples that seem to have nothing to do with the problem of chemical weapons like the Syrian problem, nothing to do with that. Verrilli, I understand that, Your Honor. Breyer, So what is your answer? That's what I want to know. Verrilli, If you'll permit me to answer the question this way. The line that the Petitioner is asking courts to draw is whether the particular use is warlike or whether it constitutes a peaceful purpose under this convention and under the implementing statute. Well, the very one of the very things we are trying to sort out right now in Syria under the Chemical Weapons Convention is where the line is between peaceful uses and warlike uses. And this phrase, peaceful uses, is not only in the Chemical Weapons Convention. It's in the Nuclear Nonproliferation Treaty, and we're engaged in very sensitive negotiations right now under the Nuclear Nonproliferation Treaty trying to draw exactly the same line. And it would be terribly unfortunate, I would submit, if the Court were to announce in the context of this case, as Petitioner is asking, a definition of what warlike constitutes that could have an unfortunate bearing on those extremes. So why don't you tell us what the line – can you tell us what the line is that we're trying to draw? And the framers of the convention and Congress in implementing the convention made a judgment that there needs to be a comprehensive ban and that you can't be drawing these kinds of lines because you can't. But, General, could I ask why that is? I mean, because this convention and the implementing legislation is very broad, and it's broad because it applies to a very large category of weapons and it applies to a very large category of uses, of conduct. So what were they thinking about, about why they wanted these very broad categories, why it's not more limited with respect either to the chemicals or to the conduct? Well, with respect to the chemicals, I think they made the judgment because you can't predict in advance how chemicals are going to be used and how toxic they will be in particular combinations and how dangerous they will be in particular combinations, and therefore, you need a comprehensive definition. Breyer, also, if you're telling me I am attempting to draw the line, that's just what I was going to do. And if you're saying it's against the national security interest, which is the first time I've heard that, that it is the national interest against the national interest of the United States for me to attempt to draw such a line, then I guess the State Department better file a brief explaining why or you ought to – or why you want to push this case, or – I mean, I'm – is that what you're telling me, that if I write the opinion that I think the law requires me to write, that I somehow am hurting the national security interest of the United States? I think there is a real risk in courts getting involved in defining a line between warlike and peaceful purposes. You're the one that got me. You know, the convention, when the convention is purposely drafted broadly. And there are additional risks in terms of this – the very act of bringing this process of line-drawing to bear, case-by-case, ad hoc judgments about what constitutes a violation and what doesn't, is going to undermine the ability of our negotiators to make treaties in the future, because they are. Kennedy, but you did not give a line to the Chief Justice's question where there was a treaty that intruded on the Federal structure. You could have a treaty where the President is required to set aside any State law that, in his view, contravenes the national interest. That's a structure problem. You've given us no principle the other way. Well, I – what I think, Justice Kennedy, would suffice to decide this case for the Court to conclude that the two-local limit that the Petitioner is advocating here, as an as-applied, case-by-case, two-local limit, is not one that is inconsistent with the constitutional structure, because if you go back to the Framers, it is clear from the era of the Framing that the Framers intended to give the national government the power using the treaty. Well, is it your precept, then, that a treaty cannot be inconsistent with our constitutional structure? This Court has said that the – this Court has said that in dictum, repeatedly, but it has said that the treaty – there's a question in a treaty power case of whether the subject matter of the treaty is a proper subject for a treaty. That's a question the Court can ask, and although I'm not prepared to draw a specific line here today, there may well be a line to be drawn. But here, the Petitioner has conceded, and I think all of us would agree, this is the proper subject of a treaty. Roberts. There are a lot of treaties, particularly, I think Justice Alito pointed out, after the World War II era, where you have international conventions affecting everything. We have international conventions on the abduction of children, international conventions, the human rights. They cover a vast swath of subject matter. And it seems to me the only thing you're saying that is a limit on what the treaty power can be as a source for is some determination, no more less – no less arbitrary than the lines other people are asking us to draw between what's appropriate under the treaty power and what's not. And I just would like a fairly precise answer whether there are or are not limitations on what Congress can do with respect to the police power. If their authority is asserted under a treaty, is their – is their power to intrude upon the police power unlimited? If the – if the treaty – well, the way I would answer that, Mr. Chief Justice, is if the treaty is valid. Okay. If the treaty is valid. Then implementing legislation that doesn't go beyond the treaty is valid, even if it addresses a subject that would otherwise be within the police power of the States. That was the judgment the Framers made. And that's what – that's this case. And so because the treaty is valid, the Petitioners conceded the treaty is valid, this statute implements the treaty word for word implementation of the obligations of the treaty. So you would rather have the Court determine, if we're concerned about the intrusion on the police power, whether treaties are valid or not, than whether determine whether particular implementing legislation is valid or not. No, I think, Your Honor, that because it is conceded in this case that the treaty is valid, and the Petitioner hasn't elaborated any argument that – any principle that would allow this Court to make a judgment about when an exercise of the treaty power is valid and when it isn't, you've got to take as a given in this case that the treaty is valid. Roberts I know this case. The point of the hypothetical is I'm trying to get your general principle. I can imagine treaties that you would say are within the treaty power, again, particularly in the post-World War II era, but that could give rise to implementing legislation that I think would be extraordinary from the point of view of the Framers and the power that it gave Congress to intrude upon State authority. So there is a structure of limitations, you know, as I said earlier. The two-thirds ratification requirement is real with respect to this – one of the treaties Your Honor just referred to, the U.N. Convention on Civil and Political Rights. Of course, when the Senate ratified it, it did use its power to make reservations to preserve our Federalist system. So that operated in exactly the manner that the Framers intended there to protect the interest in Federalism, and there are, you know, there are about 1,000 ratified treaties on the books right now, and we don't have the Congress using the treaty power to usurp the role of the State. Roberts No, no, that isn't the problem. Roberts It's kind of question-begging. I mean, the whole point is that some people think we do have exactly that in this case. Now, usually when we have a case that implicates significant and serious bilateral concerns, we get a lot of briefs and all that from our treaty partners. Is there any concern that's been expressed in any concrete way by them about whether Ms. Bond is prosecuted? Verrilli, I doubt that, Your Honor, because nobody would – we're not saying, and I don't think anybody would say, that whether or not Ms. Bond is prosecuted would give rise to an international incident. The question is whether Congress has the authority to pass a comprehensive ban. Now, there may, of course, be applications of that comprehensive ban that don't advance the national interest in a profound or poignant way. We understand that. But the question is whether Congress can pass a comprehensive ban implementing  This is the question. Kagan In general, don't we have an amicus brief from almost all of the legal counsels of the State Department, Republican and Democrat, talking about how if Petitioner's argument were accepted, it would severely damage the United States' ability to enter into and to negotiate treaties? Verrilli, That's right. And that's true, and it's – that's certainly true. I'm sure that the people who've worked in the national branch of government, particularly for the State Department, would like to have as much authority as they can get to negotiate treaties. We're concerned about limitations on other. Do we have any briefs from State legislatures, State authorities, concerning the intrusion on their prerogatives? Verrilli, Your Honor, this convention is a convention that all but four nations of the United States on earth have signed. The legislation that we have enacted is model legislation that over 120 other nations have enacted as well. Alito When this Court has issued decisions in recent years holding that there are some limits on Congress's power, cases like Lopez and Morrison and Siddiq Birney, there have been legal commentators who have written articles saying that could be circumvented through the use of the treaty power. Do you agree with that? Verrilli, I don't think there's a yes or no answer to that. I think that because I don't think it would be – the question would be what does the treaty power encompass? It wouldn't be a circumvention if this is something that could be done on the treaty power. Alito I'll back the word circumvention. Could you reach the opposite result? Could it – could Congress regulate the possession of a gun within a school zone by entering into a treaty that authorizes such legislation? Verrilli, I think the question in that case would be whether the treaty is a valid exercise of the treaty power. Breyer Oh, but it is. That's the problem. There's an underlying – I don't mean to cut you off, but I want at some point you – you seem not to see a problem that I think I see. And the problem underlying it, if you get into the treaty area, is this. Given the power, as there is in Medellin's majority, to have some self-executing treaties, in principle your position constitutionally would allow the President and the Senate, not the House, to do anything through a treaty that is not specifically within the prohibitions of the rights protections of the Constitution. That's Missouri v. Holland. And I doubt that in that document the Framers intended to allow the President and the Senate to do anything. Now, you ask us now to say whether the answer to that question is yes or no. We still have a democracy, in other words, of which the House is part. Now, if you carry it to an extreme, that's what you are. That's where you are, and I'm worried about that, and I think others are, too. So I'd ask you, isn't there an easier way to deal with this case? And you tell me, no, no, because we'll interfere with some problem of foreign affairs that was never mentioned in any brief, or at least hit me for the first time when you said it. Now, there you have an expression of my uncertainties at the moment, and any way you want to reply to that would be helpful. I understand the point, Justice Breyer, I do. I understand that there is something that seems attractive in trying to think about this as a question of statutory construction. What I'm trying to point out is that it's not as easy as it seems, that there are real risks to trying to draw a line of that kind. And yes, that does — I understand that. That does raise the stakes some. I understand that. But I think that risk is real, and I think that risk is real. The risk that the State Department legal advisor's brief pointed out is real of undermining our ability. Ginsburg. General Verrilli, before your time is out, you haven't answered directly why the bill of rights does constrain the treaty power, the implementation of it, Reed v. Colbert. Why is it the bill of rights different from the Federalism concern that the Court has expressed in many cases? When you say, yes, there is a check, the bill of rights is a check, but not the Tenth Amendment. There's a historical answer to that question, Justice Ginsburg, which is that that's how the framers understood it. I think that's clear from what Hamilton said in the quotes that we have in our brief, and others of the framers understood that that's where the line would be. And I think the reason for that is that the treaty power is itself a great and substantial independent power of the national government, and it is not constrained by a two-local limitation. That is the lesson of the era of the framing, that there is not a two-local limitation on the exercise of the treaty power. And, therefore, while in those quotes pertain to self-executing treaties, yes, there is no limitation on what the President and the Senate can impose as a self-executing requirement, namely that the States must give back to British citizens property that they confiscated or whatever else. But it's a different question whether a treaty can expand the power of the Federal Congress into areas that it has never been before. That's a separate question, and neither Hamilton or any of the other quotes that you refer to address that question. Verrilli, Your Honor, so long as the treaty – it's a valid exercise of the treaty power, I think a fortiori, if all you do is implement the treaty in hike verba, it's a valid exercise of Congress's power. And I will say, I said earlier that this is serious business. I understand that principles of Federalism are serious business also. But Federalism is a two-way street. And with respect to the exercise of the treaty power, the Framers made a judgment that this power was going to be exclusively in the hands of the national government, and it needed to be exclusively in the hands of the national government in order to ensure that the United States could be a full sovereign on the world stage. Now, it is true that the subject matter of treaties is different now than it was at the time of the founding, but the Framers understood that. They were careful not to impose subject matter limitations on the treaty power because they were wise enough to know they could not foresee what might be important for the United States to be able to negotiate about on the world stage in order to participate fully as a sovereign. That — and the Chemical Weapons Convention is a deeply apt illustration of exactly why the Framers were wise in ensuring that there were not subject matter limitations on the exercise of the treaty power. The Chemical Weapons Convention — the United States' leadership in the Chemical Weapons Convention is that this norm, which is in our national interest, our foreign relations interest, and our national security interest, is a norm that — that the nations of the world have agreed to, and that we are then in a position to — to have leverage to insist that the nations of the world abide by it. And it's leverage we are trying to exercise right now. It is critically important, and I respectfully submit that the line that the Petitioner is asking this Court to draw is not consistent with the intent of the Framers, with this Court's precedent, or with the national interest that I have described. Thank you. Roberts. Thank you, General. Mr. Clement, you have 4 minutes remaining. Clement. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First of all, the Senate's role in the ratification of treaties cannot be a sufficient political check, and one reason is that sometimes the precise role they play as a check is to make a treaty non-self-executing. And so to take Justice Scalia's hypothetical example of an international treaty that purported to regulate marriage rights, one thing that the Senate very well might do in that case is to say, well, we'll ratify it, but we're going to make sure it's non-self-executing, and maybe we'll use our spending power or something to get the States on board, but we're not just going to impose a national solution. So it doesn't make any sense to say that a non-self-executing treaty necessarily, even if it's valid, guarantees the validity of the enacting legislation, because some of the reason they make a treaty non-self-executing is to preserve Federalism. A second point is to respond to the argument, which I think I've already explained why it's not correct, but is the suggestion that there is no daylight between the convention and the statute. There is huge daylight, and the daylight is precisely whether it affects individual conduct and how it affects individual conduct. With all respect, everything on Justice Breyer's List A is not stuff that I think implicates the convention at all. But yet, under the government's unwavering theory that you can't make any limitations on the statute, that's all covered by the statute. There's your daylight. Now, I would respectfully suggest that our statutory construction argument is one way out of this. I think that you have to understand the way that peaceful is used in this statute is essentially a term of art. I would analogize it to a situation where two scientists in Antarctica get in a fist fight. Okay? That's not conduct we would condone, but I don't think we've violated our pledge to reserve Antarctica for only peaceful purposes. And that's the same way we'd like you to interpret this statute. Now, the government says you can't do that because that's going to mess up what's going on in Syria. With all due respect, I assume that the issue in Syria is whether or not the nation State of Syria is doing something that would violate the convention if, contrary to fact, they were signatory to this convention. So if you want to make clear that you're only talking about individual conduct, I think you can solve that whole problem right there. But if I'm wrong and the only way, as the government assures you, that you can make this legislation work is to have it be an exercise of the police power, well, then the answer is that the legislation is simply unjustified. Kagan.            Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. you say that's a peaceful purpose? I would say it's not, but I think it has to do more with the particular qualities of sarin gas, the fact that it's on Schedule A, the fact that nobody can possess that for any lawful use. And what makes something like vinegar or even potassium dichromate different is what puts it over the ledge, from being an ordinary chemical to a chemical weapon, is precisely its use and its use alone. Now, Justice Kagan, you asked a great question. What was Congress thinking when they did this? I think with respect, Congress wasn't focused on this issue at all. If you look at the legislation they passed to implement this, the chemical industry and others put in front of them the possibility that there was a Fourth Amendment problem with the inspections of chemical production facilities that were authorized under the Convention. When Congress had the constitutional problem in front of it, they had all sorts of provisions to deal with that constitutional concern. Now, the future Ms. Bonds of the world didn't have quite the same lobbying resources as the chemical industry, so they didn't avert to this problem. And that's precisely why some kind of clear statement rule or the like would make perfect sense in this to make sure Congress doesn't exercise the police power when all it thinks it's doing is implementing a treaty. The last thing is just to say about the State Department legal advisers. Sotomayor, about the treaty. I'm sorry. Roberts. Thank you, counsel. General, the case is submitted.